Good morning. May it please the Court, my name is Gwen Skinner, and I represent Mr. Hamad in this action, along with me is Mr. Paul Hoffman. If it's okay with the Court, with the Court's permission, I'd like to take just up to about five minutes to address the issue of whether or not the Westfall Act applies in this case, and also to be available if the Court has any questions regarding personal jurisdiction. I'm not going to take the Court's time arguing that issue, but if the Court has questions about that, I'm here to answer that. Mr. Hoffman will argue the remaining issues, the Bivens issues, the Military Commission Act, and clean up any mess I might make. And we'd like to reserve five minutes for rebuttal. First, the Court here should find that the Alien Tort Statute meets the statutory exception to the Westfall Act. The Alien Tort Statute is the 1789 equivalent of a substantive statute providing a cause of action, given that through its enactment, Congress intended to ensure that non-citizens had a cause of action and a remedy against defendants, including U.S. citizens and officials. I thought it wasn't a cause of action statute after Soray and others, that it's a jurisdiction statute. Well, I don't think it's purely a jurisdictional statute, because the Court in Sosa made it clear that through the enactment, Congress assumed the courts would exercise their common law jurisdiction to recognize a cause of action. In 1789, it was the equivalent of a substantive cause of action. But I think Sosa said pretty clearly, this is purely a jurisdictional statute. But Congress wouldn't have enacted this jurisdictional statute if they didn't think there were some common law, international law claims floating out there, which federal courts are allowed to recognize. But the statute itself, I think Sosa said pretty clearly, is purely jurisdictional. And Kiobel didn't say otherwise. Well, it's interesting. In Kiobel, I think actually boosters our argument a bit, because even though Justice Roberts said in Kiobel that it's a jurisdictional statute, which he puts actually in quotes, mind you, that he also, they also treat the ailing tort statute as a substantive statute, as they've treated other substantive statutes for purposes of the presumption against extra-tortality. So in a way, I think Kiobel supports our argument with respect to that. What they're really saying is, and we've been through a number of these cases now, is it's a jurisdictional statute. There are some, and we don't know which, international norms that may provide a cause of action. The Supreme Court hasn't seen any that it likes yet, and there may be one. But we're pretty hard-pressed to say that it's anything but jurisdictional, aren't we, after the last round in the Supreme Court? Well, I think it is difficult, but I don't think that BTS is jurisdictional in the sense that a statute that might be enacted today is jurisdictional, just because of what Congress intended to happen back in 1789. So I understand the Court's concern. I know many courts still talk about SOSA being jurisdictional only, but if you really think about what was going on in SOSA, given what Congress assumed would happen in 1789, it was the equivalent of a substantive cause of action. And I would also note that the language in Rosoul, which was issued during the same term, of course, as SOSA, the Court used the term that the ATS confers the privilege of suing. Our argument is that for purposes of the Westfall exclusivity provision, the ATS should be treated as a substantive statute. And if it isn't, I just might bring up this particular example. Let's say that there was a federal official, any federal official decides to go to an ambassador's home, because he wants the ambassador to admit to something that the country did. And that official decides, I'm going to keep this individual here, I'm not going to let him leave the house, now I'm going to withhold food and water, so this individual until he breaks. And that goes on for months. If, in fact, the Alien Tort Statute is not an exception to the exclusivity provision, that individual would not have a cause of action, assuming that he was acting under the scope of his employment. And then they have some other diplomatic immunity or something else, and that might not be the best example to use because you're getting into diplomatic immunity, aren't you? Well, that's possible, but, I mean, let's say it was a little, let's say it was an individual in an ambassador's home. An employee of the ambassador might not have the immunity. The point being is that the ATS is not an exception. That individual would have absolutely no remedy, which is contrary to what our founders wanted. It's contrary to the practice of the United States up until very, very recently. So I think it could have very troubling results. I also would like to just note that with regard to the scope of employment issue, even if state respondent superior law applies here, there are limits. As a matter of federal law, there are limits to what a federal official can do. The Ninth Circuit and the Fourth Circuit recently in the Salmontar case, after it was remanded to the Fourth Circuit, both recognized that violations of customary international law are per se outside the scope of official conduct. This Court has said that with regard to foreign sovereign immunity, and it's said it with regard to the Act of State. Haven't we also said that we're looking at whether it's within the scope as a question of state law, and Pelletier, and then in Cashin? Well, our argument in the brief, of course, is federal common law should apply. But even if state respondent superior law applies, I think that even as a matter of federal law, I mean, if the state respondent superior law is the substantive law that the federal courts apply, still as a matter of federal law, there must be some limits to what a federal official can do, again, being within the scope of employment. And one of those limits is violations of customary international law. I believe that prior case law in this circuit supports that argument, as well as the recent Salmontar case. And there are two reasons, I think, why customary international law would prevent that. This plays out in two ways. First, customary international law should be considered per se outside the scope of employment of a federal official. And second, the United States should not be allowed to substitute itself for acts that can't be official. If violations of customary international law cannot be official state acts, how is it that the United States can then substitute itself and become the defendant in those cases? Finally, to the degree that there's any ambiguity in the statutory exception to the Westfall Act or to the scope of employment issue, and, of course, scope of employment isn't defined, it doesn't say what law should apply in the Federal Tort Claim Act, the Supreme Court has actually never addressed this issue, to the degree there's any ambiguity, this Court must apply the Charming Betsy Doctrine and read any ambiguity consistent with international law. And international law requires that the United States provide a remedy to noncitizens who are harmed when their international rights are violated. All right. You've used up a little more than your time, but we'll try to be flexible with Mr. Hoffman, and then we'll be flexible as well with the government. Thank you, Your Honors. Your Honors, may it please the Court, I'm going to try to address the Bivens-related issues in the case, in particular starting with the Iqbal issue upon which the case was dismissed. And our position with respect to that is that the District Court erred in not recognizing the allegations against Defendant Gates, and we're really talking just about the Secretary of Defense here, and we're talking about the period of time from December 2006 to December 2007 when our client was held, that's the last year of his five and a half year, from our standpoint, prolonged arbitrary and wrongful detention. Do we get to Bivens at all in light of 2241E2? Well, Your Honor, the District Court, and I know this is the subject of the next case as well, the District Court found that Boumediene had found Section 7 of the MCA unconstitutional, and that's our position as well, and that E2 is not severable from E1 for the reasons that we've said in our brief and for the reasons that the District Court said. I think Boumediene, particularly at pages 737 to 738, itself talks about the interdependency of E1 and E2 and discusses it in a way where it refuses to find that another provision can only apply to E2 and not E1 at the same time. I understand that, though, because the Supreme Court was talking about the suspension clause, which pretty well is a clear aim at habeas, whereas E2 is talking about anything else. Well, E2 can include habeas. It can include habeas, and it also E2 is not, at least from our standpoint and the judge's standpoint below, is not an independent statute in that sense. I mean, it can't stand alone. It's referenced back by any other actions as to E2. Any other action, doesn't that mean, having looked at E1, it means any other non-habeas action? It could mean that, but the question of how, for example, conditions cases are handled, whether they're handled within habeas or without, you can have those issues coming up in both. Let's just sort of start through it. E1 says you don't have any habeas. Right. Okay, that's out because you do get habeas. E2 says, in effect, not only do you not have any habeas, if you're thinking about, quote, any other action, you don't have that either. So why can't E2 stand alone, which is you don't have any other action, meaning there's no action? Yeah, I think that that's based on an assumption about what Congress might have meant rather than, you know, the way that it's structured and the way that Boumediene treated it. I mean, the Supreme Court said, didn't distinguish between E1 and E2. They said it was out. And, in fact, in the Supreme Court's cases generally in this area, they're talking about a dialogue between the court and Congress. And so the question would be, would Congress, could you just take that one piece in the light of the fact that the court has found E1 to be unconstitutional? So we've got, like in cases like Booker, the Supreme Court has been extremely bullish on severance. I mean, in Booker they said, we'll rewrite the statute for you to save a portion of it. So it's hard for me to understand why, if Congress said, we don't want these detainees to have any action, habeas or otherwise, that if the habeas falls because of the suspension clause, why they wouldn't want to retain the part that says any other. Well, I mean, I understand that. And we've made our arguments about why this should not be severed. I mean, one additional argument is that if you read it the way we suggest, you avoid a series of constitutional arguments, which is another principle of construction that's quite important, it seems to me, because you would then have to reach, which the district court found it didn't have to, the various arguments that we've made that E2 would be unconstitutional. One question I had, if I could interrupt you for a moment about that, because I did look at those arguments and thought they raised real complex questions, but Vance, the Seventh Circuit en banc in Vance was indicating, well, there are alternative remedies, as in Bivens, like under the Foreign Claims Act. Is that an action that your client would have had here? We don't believe so. Why is that? Well, for one thing, I mean, the Foreign Claims Act is a kind of ex gratia payment act. It facilitates the ability for U.S. forces, for example, if there's a drone strike that kills innocent civilians, that money can be handed out. It's not designed for this purpose. It's not designed for a person who's been found in the process, initially to be an enemy, a combatant. And I would say that if the Federal Tort Claims Act, for example, is not an alternative remedy, which is the case under Cawson v. Green, I don't think that you could find that the False Claims Act would be. And, in fact, it seems like it was thrown in as an afterthought by the government, because the government always argued special factors, and then I think because it was mentioned in Vance as one of the list of things. which I looked at, which expressly says that prisoners of war or detained aliens would be able to bring a claim under the Foreign Claims Act. So is there any reason why Mr. Hamad would not fall within that? Your Honor, it was our understanding that he couldn't, but I'm not an expert on the False Claims Act, and it was not decided in the district court on that basis. So we've addressed the issues that came up. I mean, it really hasn't even been very much briefed here. And I would suggest that a statute that allows for discretionary payments in that way is not an adequate alternative, notwithstanding the fact that the courts have found many different kinds of statutes to be adequate alternatives. But here you're asking us to imply a Bivens action, basically. Well, yes, but I mean, I think what we're asking is, this is pretty core Bivens from as far as we can see. I mean, you're talking about having a man who's never been charged with a crime, who's taken from his apartment in Pakistan, he's put in different, I mean, subjected to other treatment, which is not part of the claim against Gates, and then for five and a half years is kept in detention, and for the last two years of it, after the Department of Defense's own procedures have found that there's no reason to keep him in detention anymore, is kept in detention. It seems to us that you're starting out, and I think this is what Judge Hamilton said, albeit in dissent in advance, you're starting out with Bivens. And then the question is, is there some reason, based on the court's precedence, not to go to Bivens? And I think that in a case like this, I mean, Bivens is about the role of the courts to enforce the Constitution. I think that the courts have clearly been reluctant in many different areas where Congress has legitimately dealt with ways of trying to accomplish questions, like the APA and other areas, has declined to grant the Bivens remedy. But I think that there comes a point, really, and I think the Supreme Court has done this in all the Guantanamo cases, where if Congress is not going to allow the enforcement of the Constitution, if that's what its intent is, if you read all these provisions, including the MCA, as Congress is saying, we're just going to lock them up. It doesn't matter. It doesn't matter if the Constitution says otherwise. We're just going to lock them up. I think that the core principle of Bivens is that the courts have a responsibility to do something about that. And that really is the heart of our case. The client has a habeas remedy, I guess. That's what Boumediene decided, correct? Well, he's out now. He had one with respect to conditions of confinement and detention. So there is that remedy for? Well, it's for him. It's just like the Bivens remedy. It's damages or nothing. I mean, he didn't even have his habeas heard by the time. He was in for five and a half years with no charge or trial, you know, in circumstances where, you know, he just worked for humanity. It's like Mr. al-Nashiri. He's no longer in the custody or even in the geographic presence of the U.S. Exactly. So the only question is whether there's a damages claim against an individual, correct? Right. There are damage claims against individuals. And I think that that is the core of Bivens. And one of the separation of powers argument, the constitutional argument that the court would have to get to, which I agree is very complex, and one of the reasons we think you can avoid it by seeing the MCA the way we do, is that Bivens is about the court's power. I don't think Congress has the ability to take that away from the courts. The courts themselves, the Supreme Court itself, can go along with what Congress does and can, in an instance of self-abnegation, not exert that power. But I don't think Congress can take it away from you. I think that Bivens is about the ability of the court to enforce the Constitution. And I think what we're saying is this is that case. If you don't see the MCA the way we see it, this is that case. This is about Congress, if you take the Vance majority and the way they look at it, is that Congress doesn't want the Constitution enforced. And then I think it's in this court's ballpark, and then the Supreme Court's ballpark. And that ballpark is, does Congress have the right to tell the courts that they can't enforce the Constitution in a case as egregious as this? Do you want to stay for your remaining time? Yes. Yes, Your Honor. May it please the Court, Sidney Foster for the United States, former Secretary of Defense Robert Gates, and the other named individual defendants. Your Honors, there are multiple independent grounds upon which the district court's dismissal of the complaint here may be affirmed. I'd like to just address quickly one statement made by opposing counsel just now, and then I'd like to turn to the 2241E2 argument, unless this court has other questions. But I just wanted to address the argument that counsel made that violations of customary international law should be per se outside of the scope of employment for Westfall Act substitution purposes. As we've explained in our briefs, the question is governed by state-responding yet superior law, so that's what this court should look to. The cases that a plaintiff is citing for the proposition that customary international law is per se outside of the scope of employment are set in the foreign official immunity context. That's very different. No court has ever held that a case on that context should be somehow imported into the federal official immunity context. And furthermore, those cases are about use of Kogan's not customary international law. Just wanted to point that out, but then move on to the argument that we made that this whole action is barred by 28 U.S.C. Section 2241E2. And I think there's very little question that the plain language of the statute covers this action. The district court here held that 2241E2 did not survive the decision in Bumadine, relying principally on the language in Bumadine saying that Section 7 of the Military Commissions Act is unconstitutional. It's a violation of the suspension clause. I think as your questions were indicating, it doesn't make sense, though, to interpret that statement as striking down 2241E2. Although 2241E2 is a part of the Military Commissions Act Section 7, that section also includes 2241E1, as you noted, and that's the section that bars habeas actions. As you noted, Section 2241E2, by contrast, covers any other action, which means non-habeas actions. Well, the one difficulty I have I'd like you to address, and that is, let's just say we're with you so far and we get that E2 could stand, but E2 is tied up both at the beginning and the end with this enemy combatant and the Detainee Treatment Act. And those are kind of out the door now. So then what are you left with? Well, Your Honor, I think it helps to step back and look at kind of what's happened over the course of the years to kind of the statutory provisions of the Detainee Treatment Act and the Military Commissions Act. So you're right that 2241E2 provides that judicial review is not allowed for actions except for two categories that were provided in the Detainee Treatment Act. One was a mechanism for challenging the lawfulness of an individual's detention. That was through challenges to the combatant status review tribunals in the D.C. Circuit. The other exception to 2241E2 was to challenges to military commission decisions. Now, a plaintiff in this case and the other case, I think, more so points out that those statutory references don't go anywhere. So as a conceptual matter, I can understand there would be a concern about 2241E2 standing, but what's important for the court to understand is that the two types of judicial review that were provided under those two subsections still exist. They're just in substituted form. So for that first type of judicial review, the one that was under the Detainee Treatment Act 1005E2, that was the review for challenging the lawfulness of an individual's detention. That review has now been replaced by habeas review after the Supreme Court's decision in Boumediene and the D.C. Circuit's decision in Bismillah. So that kind of review still exists, and there's no need for an express exception to 2241E2 to cover it because habeas isn't covered by 2241E2 to start with. The other type of review that is accepted from the coverage of 2241E2 is the challenges to the military commission decisions, and that was originally provided in Section 1005E3 of the Detainee Treatment Act. Now, in the other case, more than this case, plaintiff points out that that provision doesn't exist anymore either. That doesn't exist because Congress actually just deleted it. Repealed that, right? What's that? That one's actually repealed, correct? Right, they repealed it as a conforming amendment because Congress chose to in 2000... But the D.C. Circuit and the whole process. Exactly, and they just put the judicial review provisions at 10 U.S.C. 950G instead of also putting them in the Detainee Treatment Act as had been the case under the Military Commissions Act of 2006. And the 950G, that ability to challenge isn't affected by this E2, correct? That's right. If review is available under 950G, then E2 plainly doesn't bar that review. In terms of statutory construction, since the DTA is out, you basically say, okay, you have habeas now because the Supreme Court said, but you have no other review of anything. Then you have to go, however, and say, well, that's what E2 says, but now we have to go to some other statute, which is the amendment to the Military Commissions Act, right? And say, well, that's not really true that you don't have any. No court can touch this. A court can touch this if it comes up through the Military Commissions, correct? That's right. I mean, we think that 2241E2 needs to be read side by side with 10 U.S.C. 950G so that when review is provided under 950G, then plainly Congress meant for 2240E2 not to be applicable. And I think there's no dispute with either plaintiff that that's the proper interpretation of the statute. Let me ask you this. Do you think that E2 stands only as it relates to enemy combatants? I don't think this court needs to. I'm asking you. Well, the answer is no. Are you referring to the fact that the government no longer uses the term enemy combatant? Correct. I mean, the answer is no, and I can explain why, but I don't think that either of these cases. The reason I think we have to understand that is if we're going to construe a statute, then we have to understand what the impact of that is, not just for this case but for others. And so I'm imagining that there's a new detainee who never was an enemy combatant because that process got jettisoned. And then it turned out, at least in his view, that he was wrongfully detained like Mr. Hamad and he never got let go, and then, boom, they say, okay, you're out. So now he wants to sue. He's not in the military commission world because he's gone home or gone somewhere, and he's not an enemy combatant under E2. Can he sue? Well, Your Honor, if he were at Guantanamo, then he would certainly have rights to file a habeas petition. No, no, he's not there. Remember, he went home. He's not Mr. Hamad. Oh, I see. I'm sorry. He's out. He's gone. I'm sorry. He wants to sue, but he's never been an enemy combatant because he didn't fall in that category. Okay. Well, just to make sure I understand the assumptions here, I mean, he would have been concluded at some point to have been lawfully detained, and then the question is? Who knows? He's here, and then they say, whoops, now is the time. You no longer need to be here. He's never been determined to be an enemy combatant because we know at a certain point that whole system got abandoned. Right. So the government no longer uses the term enemy combatant to label whether or not someone is lawfully detained. It is our position, although we don't think you need to get into it in this case because it's plain, in this case and the other case, that the plaintiffs here were determined to be enemy combatants by combatant status review tribunal. So there's no occasion in this case for this court to examine the application of a statute to individuals who never went through that process. But to answer your honors question, we do think that it continues to apply in the following sense. So the purpose of the statute was essentially to trigger application of the bar any time the government made a determination that an individual was lawfully detained. When the statute was enacted, the executive branch used the term enemy combatant as shorthand for its determination that individuals were lawfully detained. Now the government no longer, the executive branch no longer uses that shorthand, but we think that the idea of the statute still applies. But then I feel like we're completely rewriting the statute then. So we now have these unprivileged, what are they called, unprivileged enemy belligerents is the new term. Is that right? So if we have a new person that's an unprivileged enemy belligerent, we're supposed to, according to you, read the statute to say, okay, there is no DTA, but this statute of no claim of any kind also applies to the enemy belligerents, even though it doesn't say anything about enemy belligerents. Well, your honor, the term unprivileged alien enemy belligerent, that's a term within the military commission context, and it's not actually the term that's used generally in habeas litigation to indicate that the executive has determined that someone's lawfully detained. Instead, there's no real shorthand anymore for kind of that. See, that's kind of one of my issues, is that I feel like we're in this world where every time you pull a string, we've got a potential problem, and I recognize that Mr. Hammad was designated an enemy combatant, but you're taking the position that even if somebody comes in now and then they got sent home so they can't be under the military commission anymore, they don't have any D.C. circuit to go to, you're also saying they wouldn't have any kind of claim, because we'd look to this statute and we would somehow substitute what? Your honor, we would say that this statute would apply if there had been some kind of determination that they were lawfully detained under the laws of war. Two quick points. I mean, one, the standard that the government applies now for determining whether someone's lawfully detained is actually very similar to the standard that was applied for determining whether someone was an enemy combatant. It's actually a subset of kind of, if someone was lawfully detained under the current standard, they were certainly lawfully detained and would have qualified as an enemy combatant under the old standard. So on one level, that could address your concern to some degree. But second, I just want to emphasize that this is really not a case where this court needs to get into those questions, because there's no doubt here that the plaintiff was determined to be properly detained as an enemy combatant. A combatant status review tribunal came to that conclusion. So the questions that your honor is positing are very interesting. Well, they're not just interesting, but they're important to the court to figure out how much can you rewrite this statute. Absolutely. But I just don't think that they need to be decided today. They can be decided in a case where someone comes before the court and has been determined to have been lawfully detained, but never was labeled an enemy combatant. And then at that point, this court or whatever court is hearing that claim can address that question of statutory construction. I think there's no doubt that the statute has been triggered here because plaintiff was determined by a combatant status review tribunal to have been properly detained as an enemy combatant. I have another question on your section E2 argument. You, in effect, made the argument that the constitutional challenge fails because it presupposes a constitutional right to money damages. That's right. Which, of course, has been read to mean there's no constitutional right to a Bivens-type action for money damages. But that doesn't really speak to the other part of potential claims, which would be for injunctive or declaratory relief. So where does that come out? Your Honor, I mean, again, I don't think that this case raises that question. This is a case. I should ask you that in the next case. Exactly. Okay. I'll wait. Keep that in mind. I'd like to turn to the Bivens questions as well, since we think that, you know, as the Fourth, Seventh, and D.C. Circuits have held, it's inappropriate for this court to create a common law damages remedy in the military detention context. Now, there are two parts, of course, to the Bivens analysis, whether it's appropriate to create such a remedy. The first part looks to Congress's actions to see whether Congress would have expected this court to stay at Bivens' hand. And then the second part, of course, looks to whether there are special factors. We think under both prongs of the analysis that it would be inappropriate for the court to recognize a Bivens remedy here. I'm going to start with the first prong. Congress has extensively legislated in the area of detainee affairs in the Detainee Treatment Act of 2005 and in the Two Military Commissions Act. Congress has created a comprehensive set of remedies, as we were just discussing, for detainees. And it's tellingly has not provided a damages remedy. And that determination cannot be determined inadvertently in light of the legislative history of this. While Congress hasn't provided a damages remedy, it has provided a limited avenue for seeking compensation, and that's under the Foreign Claims Act, where a plaintiff could have filed a claim with the relevant military department to seek compensation for his alleged injuries. On the Bivens action, we often get into this kind of a Mobius strip of whether something is statutory standing or whether it's something else. So I'm interested in your position on whether, in your view, we could look at this case solely on Bivens as a preliminary threshold issue akin to statutory standing, or whether we would have to also decide the jurisdiction issue. Your Honor, as we noted in our briefs, there are certainly other courts that have held that questions of statutory jurisdiction need not be decided, be it for other threshold issues like the Bivens issue here. You know, we don't have a strong view on what this court would do. We just pointed that out. We think this court could decide on either the 2241E2 ground or it could address the Bivens remedy first. Has any court actually held, because I saw some courts sort of assume, but I didn't see any court actually hold that Bivens was the sort of threshold non-merits issue that you could decide before a question of subject matter jurisdiction, which E2 would strip us of. Yeah. Your Honor, off the top of my head, I'm not aware of any case where the court has done that. The cases that have held that statutory jurisdiction need not be given priority, I think, have framed kind of that holding pretty broadly. What's the difference between statutory jurisdiction and subject matter jurisdiction? It seems like there was one court referred to statutory jurisdiction, but I don't think the Supreme Court ever has. So if we lack subject matter jurisdiction, the only thing, we have no authority to do anything. So I don't think putting the word statutory before it changes the nature of that. Yeah. And we're fine if this court wants to reach the 2241E2 issue. I mean, I think the basis for those holdings of those courts that have held that statutory is different from Article III subject matter jurisdiction is simply that Steele Co. referred kind of repeatedly to the fact that the jurisdictional question there was an Article III question, not a statutory question. But we would be happy for this court to reach the 2241E2 argument, and we think that it plainly bars a jurisdiction here. And I should note I'd be happy to address any questions that you have about the constitutional challenges to the statute, if you have any. But if the court doesn't have further questions about that, I might go back to the Bivens analysis. And we were talking about the first prong of that analysis, about whether Congress has essentially treated this issue and provided the remedies that it thinks is adequate. And as I was explaining, it has comprehensively treated the issue, providing remedies, including the one under the Foreign Claims Act. And as the Seventh Circuit's en banc decision in advance explained, the enactment of the Foreign Claims Act shows that Congress has attended to the fact that military may injure detainees, and it has decided that compensation should come not from the individual pockets of the officials at issue, but instead from the Treasury under the process under the Foreign Claims Act. So we do think that Congress's actions in this field suggest that Congress would not have wanted this court to supplement the remedies that it provided with a new damages remedy. And if that weren't enough, we think separately, special factors counsel hesitation here. And again, the special factors that we need to think about, as the Supreme Court has held in Bush v. Lucas, turn not on the merits of the remedy, but the question of who should decide whether a remedy should be provided. And as the Fourth, Seventh, and D.C. Circuits have held in this military detention context, it's more appropriate for Congress than the courts to decide the question of whether a remedy should be provided. That falls for a couple of reasons. One is that the Constitution has committed authority over the military and national security, primarily to the political branches, and that's a factor that the Supreme Court found to be irrelevant in its Stanley special factors analysis. But in addition, as other courts have explained, the political branches have the expertise and the institutional capacity to evaluate the pros and cons of creating a damages remedy in this very sensitive context. Of course, a damages remedy could have potential negative chilling effects on these very sensitive national security decisions that are issued here, decisions relating to diplomatic discussions with other countries. And Congress and the President are in a better position to evaluate what the potential negatives could be, and then to tailor any remedy to mitigate against those harms. And I think if we look at the particular claims at issue here, well, I see my time is up. Okay. If we look at the particular claims here, I think we see why that's so. A plaintiff here is challenging his continued detention as a member of the enemy during an armed conflict. He's also challenging the timing of his discretionary transfer out of law of war detention, which includes decisions relating to diplomatic discussions with another country. Those are all very delicate questions or decisions that were being made, and it would be better for Congress to evaluate the impact that a damages remedy kind of stemming from those types of delicate decisions would have on the decisions that are being made. Of course, the concern would be that individuals who are making those decisions might prioritize kind of their wallet over national security, and even when a particular action would be constitutional and would be in the best interest of the national security, they may, out of fear of being held liable and being subject to suit down the road, they may end up taking the choice where they do not prioritize national security. So it's more appropriately for Congress to decide the appropriateness of a remedy in that context. Thank you. Thank you. Why don't you add back so it's four minutes for rebuttal, give a little extra time. Thank you, Your Honor. Let me just quickly make a couple of points. Obviously, all of us have briefed these issues, so I think our positions are relatively clear. I think that the exchange that you had with counsel about the complications of taking E1 away from E2 and all the changes underscores that there are limits to how far the court should rewrite a statute based on what you might think Congress intended, and I think that's the underlying point that the court below made and that we make, which is that even if there's a hope that you could sever provisions, like the Alaska case where you could sever the legislative veto from a whole other set of statutes, this is a different kind of case where everything really is intertwined in a way where Congress, if it wants to, and it's certainly shown the ability to do it, can legislate as it chooses in response to Boumediene's invalidation of E1. With respect to the last point that was made on special factors, and I think qualified immunity wasn't raised, but I think that we've briefed those fairly substantially, the district court has laid out. We obviously agree with that. The point that we disagree with the court about is the plausibility analysis under Iqbal, if the court reaches that. And I think the main point that I wanted to make there is that Secretary Gates, to be sure, is a cabinet official, and I think Iqbal talks about the fact that you're going to have to have some higher level of burden when it comes to a high-level official. But this is a completely different kind of case. This is not a case where things are happening at a relatively low level, and it's implausible to think that the person at the top really knows about them or is in charge of them or is engaged in purposeful discrimination, as was the case in Iqbal. This is a case where Secretary Gates came into office right in the middle of a national controversy about this issue, about what to do about Guantanamo, about what to do about innocent people in Guantanamo. The letter from congresspeople talked about the fact that there were innocent people in Guantanamo, and this was something that the United States should be embarrassed about and that he should deal with. And the fact that he's a defendant in a habeas, I mean, I would grant you that it's not clear that he would know all of those things, but in the habeas proceeding in which he was a defendant, there was a summary judgment motion before he took office that laid out in graphic detail all of the evidence that this guy was innocent. It is plausible that in the midst of a national controversy where there's media attention, NGL reports, congressional interest in it, that the Secretary of Defense would plausibly do something about that or decide to just continue the program, which is a direct action, or just doesn't care and was deliberately indifferent to the fact that our guy was just sitting there for two years after the point where there was no reason for him to be in detention, even though there wasn't any reason for him to be in detention from the beginning. At least for those last two years and at least for the last year, I mean, Secretary Gates, I think we have plausible allegations that when you add them all up in that time frame and his role and what he was doing and what his responsibilities were, are much more like Starr versus Baca. And Sheriff Baca in L.A. runs the largest jail in the world. He doesn't know what goes on in Twin Towers or when people are being beaten up in holding cells necessarily. He couldn't plausibly say that. But at a certain point when there's enough public outcry and when there are enough cases and when there's enough claims like the habeas case here and others, well, then it becomes plausible that the person at the top should be held accountable, at least at the point of a pleading standard. I mean, it's clear that there may be other defenses. There will be other defenses. I mean, in a case like this, you would litigate qualified immunity five times by the time you got to a trial. But at least from the standpoint of getting into the case and pleading, we think the district court was wrong in finding that Iqbal wasn't satisfied in this case, and therefore we would ask the court to reverse the district court and let the case go forward for this man who really deserves his day in court in this really a case that's a core constitutional issue for the court to handle. One last question. Yes. Could you file a Foreign Claims Act case for him at this point? Well, I don't – I mean, one of the other additional problems is that, as I understand the Foreign Claims Court, you have to file within two years of accrual. And I don't know what accrual means when you're put in Guantanamo from 2003, I believe it is. When was he released? He was released in December 2007. Okay, thank you. Okay, thanks. Thank you, Your Honor. Thank you. The case just argued, Hamad v. Gates, is submitted. Thank you both for the very extensive briefing and argument. The next case for argument will be Al-Nashiri v. McDonald. Thank you.
judges: Alarcon, McKeown, Ikuta